DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON (CA Bar No. 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:   (202) 307-6422
Fax:            (202) 307-0054
Email: Amy.T.Matchison@usdoj.gov
         Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF:<br><br>JOHN DOES, United States person(s), who directly or indirectly, were paid through, by, or on behalf of JustAnswer LLC, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "JustAnswer"), $5,000 or more for answering questions on the JustAnswer Platform, in any one year, for the period January 1, 2017, through December 31, 2020. | Civil Number:<br><br>**DECLARATION OF JOHN WOOD IN SUPPORT OF EX PARTE PETITION FOR LEAVE TO SERVE "JOHN DOE" SUMMONS** |

I, John Wood, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a duly commissioned Supervisory Internal Revenue Agent ("Supervisory Revenue Agent") assigned to the Internal Revenue Service's ("IRS") Small Business/Self-Employed ("SB/SE") Division.

2.      John Wood is not my real name.  It is a pseudonym I use in my official capacity as an employee of the IRS.  This pseudonym is for privacy and safety reasons. It is registered with the IRS in accordance with IRS procedures (Internal Revenue Manual § 10.5.7), and all IRS procedures governing the use of the pseudonym have been followed.

3.      I have a bachelor's degree and master's degree in accounting.  I am licensed

as a certified public accountant in the states of Nevada and Arizona.  I hold certifications as a fraud examiner and in financial forensics.

4.      I have been a Supervisory Revenue Agent since May 2024.  From May 2023 to May 2024, I was a Lead Revenue Agent in the SB/SE Division.  From September 2014 to May 2023, I was a Revenue Agent in in the Special Enforcement Program ("SEP").  SEP is a specialized compliance program directed toward that segment of the United States' taxpayer population that derives substantial income from either legal or illegal activities and intentionally understates their tax liability.  Prior to 2014, I served as a Revenue Agent in the SB/SE Division of the IRS.  My post of duty is in Las Vegas, Nevada.

5.      During my time as a Revenue Agent, I have conducted many income tax examinations in which the focus has been underreported income.

## I.    BACKGROUND

6.      The JustAnswer Platform consists of the website, JustAnswer.com, and associated websites and applications through which members of the public ("Customers") can post questions on a variety of different topics, which are answered by professionals ("Experts"), such as doctors, lawyers, veterinarians, engineers, and tax professionals.

7.      Customers are charged a fee to join the JustAnswer Platform plus a per-question fee or a monthly subscription fee.  JustAnswer pays a portion of the Customer fees to the Experts and retains the rest.

8.      The IRS, SB/SE Division, in collaboration with the Office of Fraud Enforcement (OFE), is conducting an investigation to determine the identity and correct federal income tax liability of U.S. persons who received payments for answering questions as Experts on the JustAnswer Platform for the years ended December 31, 2017, through December 31, 2020.

9.      As the organization responsible for enforcing and administering the internal revenue laws of the United States, the IRS has become aware of significant tax compliance issues relating to U.S. persons who receive compensation for providing

goods and services through technology platforms.

### A. Tax Noncompliance & Individual Business Income

10. Individual business income is income earned by a sole proprietorship, which is an unincorporated business carried on by an individual. A sole proprietor files a Schedule C (Profit or Loss from Business (Sole Proprietorship)) with his or her individual income tax return, Form 1040, to report income derived from and claim deductions for expenses incurred in carrying on the business. A sole proprietor with net earnings from self-employment of $400 of more must also file a self-employment tax return, Schedule SE, and pay self-employment taxes.

11. When there is limited third-party information reporting of the individual business income earned by a sole proprietor to the IRS, there can be an opportunity to underreport income.

12. Overall tax noncompliance is measured by the so-called "tax gap," which is "the amount of tax liability for a given tax year that is not paid voluntarily and timely."[1] The gross tax gap is divided into three components:

   a) Nonfiling (tax not paid on time by those who did not file required returns on time);

   b) Underreporting (tax understated on timely filed returns); and

   c) Underpayment (tax reported on time but not paid on time).[2]

13. For example, the IRS projects that, for the tax years 2017 through 2019, the gross tax gap was an average of $540 billion per year, with $41 billion attributable to Nonfiling, $433 billion attributable to Underreporting, and $66 billion attributable to Underpayment.[3]

---

[1] Publication 1415, Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2014-2016, 1 (Oct. 2022) ("2022 IRS Report"), *available at* https://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/MCX4-DR2K].

[2] *Id.*

[3] *Id.* at 27 tbl 7.

14.    For 2014 through 2016, underreported individual business income was estimated to be the single largest contributor to the gross tax gap.[4]

15.    For decades, the IRS has been aware of tax noncompliance issues associated with the underreporting of individual business income.

16.    In April 1996, the IRS published a report ("1996 IRS Report") finding that the Underreporting of two items of individual business income (non-farm proprietor income and informal supplier income) accounted for an estimated total of $78.4 billion in lost tax revenue for the three tax years 1985, 1988, and 1992, comprising approximately 31.8 percent of the total estimated gross tax gap.[5]  The 1996 IRS Report reflected that unreported individual business income is the single largest component of the tax gap.

17.    Subsequent research conducted by the IRS through October 2022 has confirmed and reinforced the conclusion that individual business income is the single largest contributor to the tax gap.  In reports issued by the IRS, the Underreporting of individual business income was estimated to be:

    a)  $109 billion for the tax year 2001, representing 31.6 percent of the gross tax gap;[6]

    b)  $122 billion for the tax year 2006, representing 27.1 percent of the gross tax gap;[7]

    c)  $125 billion annual average for the tax years 2008 through 2010,

---

[4] *Id.* at 11 tbl 2.

[5] Publication 1415, Federal Tax Compliance Research: Individual Income Tax Gap Estimates for 1985, 1988, and 1992 ("1996 IRS Report"), at 13 tbl. 6, *available at* https://www.irs.gov/pub/irs-soi/p141596.pdf [https://perma.cc/QRX8-MFW3].  For all reports following the 1996 Report, the line items "Nonfarm Proprietor Income" and "Informal Supplier Income" were not presented separately.

[6] Tax Gap Map for Tax Year 2001 (Feb. 2007), *available at* https://www.irs.gov/pub/irs-soi/01rastg07map.pdf [https://perma.cc/XT7L-ZQSK].

[7] Federal Tax Compliance Research: Tax Year 2006 Tax Gap Estimation (March 2012) ("2012 IRS Report") at 2, *available at* https://www.irs.gov/pub/irs-soi/06rastg12workppr.pdf [https://perma.cc/RQ8X-5GWM].

representing 27.3 percent of the gross tax gap;[8]

    d) $110 billion annual average for the tax years 2011 through 2013, representing 24.9 percent of the gross tax gap;[9] and

    e) $130 billion annual average for the tax years 2014 through 2016, representing 26.2 percent of the gross tax gap.[10]

18.    The IRS projects Underreporting of individual business income to be $158 billion and $182 billion for tax years 2020 and 2021, respectively, representing 26 percent of the gross tax gap.[11]

19.    These figures do not include the self-employment tax underreporting associated with the underreported individual business income, nor do they include the income or self-employment tax attributable to nonfiling.

20.    In addition to the sheer magnitude of the portion of the tax gap attributable to underreported and unreported individual business income, the rate of noncompliance for this category of income is a significant aspect of the tax noncompliance issue.

21.    To measure the level of reporting noncompliance for a particular return line item of income, the IRS uses the net misreported amount ("NMA") and the net misreporting percentage ("NMP").  The NMA is the dollar amount of misreporting for the given line item.  The NMP is the net reported amount as a percentage of the amounts

---

[8] Publication 1415, Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2008-2010 (May 2016) ("2016 IRS Report") at 7, *available at* https://www.irs.gov/pub/irs-soi/p1415.pdf [https://perma.cc/HXD4-NW6V].

[9] Publication 1415, Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011-2013 (Sep. 2019) ("2019 IRS Report") at 11, *available at* https://www.irs.gov/pub/irs-prior/p1415--2019.pdf [https://perma.cc/BTH9-ES2D].

[10] 2022 IRS Report (Exhibit 1), at 11.

[11] Publication 5869, Tax Gap Projections for Tax Years 2020 & 2021 (Oct. 2023) at 13, *available at* Publication 5869 (10-2023) (irs.gov) [https://perma.cc/LE5G-A7AN].

that should have been reported.[12]

22.    For example, if the gross receipts of a self-employed taxpayer were reported on the tax return as $60, but the taxpayer received, and should have reported, gross receipts of $100, the NMA would be $40 ($100 that should have been reported less $60 actually reported) and the NMP would be 40 percent ($40 over $100 that should have been reported).

23.    The IRS has estimated that Nonfarm Proprietor Income,[13] the largest item of individual business income, had NMPs of:[14]

      a)  57.1 percent for the tax year 2001;

      b)  64 percent for the tax years 2008 through 2010;

      c)  56 percent for the tax years 2001 through 2013; and

      d)  57 percent for the tax years 2014 through 2016.

24.    Aside from Farm Income, no other individual income item has been estimated to have a higher net misreporting rate than Nonfarm Proprietor Income.

25.    Thus, both in terms of its absolute share of the tax gap and the level of misreporting, the underreporting of individual business income is one of the IRS's most significant compliance issues.

---

[12] *See* 2022 IRS Report at 5-6, *available at* https://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/MCX4-DR2K].

[13] Nonfarm proprietors' income measures the income, before deducting income taxes, of sole proprietorships, partnerships, and other private nonfarm businesses that are organized for profit but that are not classified as corporations.  Sole proprietorships are businesses owned by a single individual. Partnerships include most associations of two or more of: individuals, corporations, noncorporate organizations that are organized for profit, or of other private businesses.  Other private businesses are made up of tax-exempt cooperatives, including credit unions, mutual insurance companies, and rural utilities providing utility services and farm marketing and purchasing services.  Chapter 11_Nonfarm-Proprietors-Income (bea.gov) [https://perma.cc/NWA5-TLJF].

[14] Tax Gap Map for Tax Year 2001 at 3; 2016 IRS Report at 18 tbl. 6; 2019 IRS Report at 20 tbl. 5; 2022 IRS Report at 20 tbl. 5.

**B.    Tax Compliance & Information Reporting**

26.    The IRS's research shows that the significant level of noncompliance associated with individual business income is not a coincidence; it is the result of the lack of sufficient third-party information reporting associated with individual business income.

27.    Common sense dictates that a taxpayer who performs services for clients and receives a Form 1099 that is filed with the IRS is more likely to report the income on his or her tax return than a taxpayer who does not receive Form 1099.  But the degree of misreporting between these two hypothetical categories of taxpayers is substantial.

28.    Beginning in 2007, the IRS has been analyzing NMPs by grouping items of income based on the level of information reporting—termed "visibility"—and whether income tax withholding is required.  In each research report, the IRS has concluded that for the individual income tax, reporting compliance is far higher when income items are subject to information reporting and even higher when also subject to withholding.[15]

29.    The four categories used by the IRS are:

  I.    Amounts subject to substantial information reporting and withholding

  II.    Amounts subject to substantial information reporting

  III.    Amounts subject to some information reporting

  IV.    Amounts subject to little or no information reporting

30.    For items of income subject to substantial information reporting and withholding, Category I, the NMP is approximately 1 percent.  In sharp contrast, for amounts subject to little or no information reporting and no withholding, Category IV, the NMP has been estimated to range between 53.9 and 63 percent.[16]

31.    Nonfarm Proprietor Income, the largest component of individual business

---

[15] 2022 IRS Report at 13; 2019 IRS Report at 13; 2016 IRS Report at 11.  *See also* 2012 IRS Report at 1-2; Tax Gap Map for Tax Year 2001 at 2.

[16] 2022 IRS Report at 14 fig. 3; 2019 IRS Report at 14 fig. 3; 2016 IRS Report at 12 cht. 1; 2012 IRS Report at 4 cht. 1; Tax Gap Map for Tax Year 2001 at 2.

income, is Category IV income not subject to withholding and subject to little or no information reporting.  As such, the information reporting gap is a key driver in the associated tax noncompliance of individual business income.

### C.    The Rise of the Gig Economy

32.    The gig economy—otherwise referred to as the sharing economy, platform economy, access economy, or on-demand economy—is described by the IRS as "activity where people earn income providing on-demand work, services or goods. Often, it's through a digital platform like an app or website."[17]

33.    The gig economy is a relatively recent phenomenon associated with the increased prevalence of smart phones and their applications beginning around 2008, facilitating the development of online marketplaces and platforms in which individuals can connect to obtain and offer goods and services.[18]

34.    Digital platforms, including websites and apps, commonly serve as intermediaries, directly connecting sellers and service providers with consumers and processing payments.  Well-known examples of such platforms include Airbnb, Uber, Lyft, DoorDash, Etsy, Handy, and TaskRabbit.[19]

---

[17] *See* Gig Economy Tax Center, https://www.irs.gov/businesses/gig-economy-tax-center [https://perma.cc/ZMF3-GY6J].

[18] *See* Government Accountability Office, *Taxpayer Compliance: More Income Reporting Needed for Taxpayers Working through Online Platforms* 4, GAO-20-366 (May 2020) ("GAO Report"), *available at* https://www.gao.gov/products/gao-20-366[https://perma.cc/KQ4W-TRFC].

[19] *Id.* S*ee also* Caroline Bruckner, *Shortchanged: The Tax Compliance Challenges of Small Business Operators Driving the On-Demand Platform Economy* 4 (May 2016) ("*Shortchanged*"), available at https://www.american.edu/kogod/news/shortchanged.cfm [https://perma.cc/4WBN-MVWH].

35.    In 2016, available studies indicated that as many as 45 million Americans had offered some good or service at some point in the gig economy and that likely more than 2.5 million Americans were actively participating in the gig economy.[20]

36.    A more recent study conducted in 2021 estimated that approximately 16 percent of adult Americans have earned money by doing gig platform work and approximately 9 percent of adult Americans were current or recent gig workers.[21]

37.    Despite the difficulties in precisely measuring the size of the gig economy and the number of participants, the studies agree that the gig economy is expected to grow considerably in the years to come.

**D.    The Information Reporting Gap in the Gig Economy**

38.    For decades, persons engaged in a trade or business have been required by § 6041 of the Internal Revenue Code (I.R.C.) (26 U.S.C.) to file information returns with the IRS to report payments made to nonemployees of $5,000 or more during the tax year.

39.    The information return required to be filed with the IRS for this type of compensation was Form 1099-MISC for tax years prior to 2020 and Form 1099-NEC for tax years 2020 and after.  Withholding of tax on these payments is generally not required.

40.    In 2008, before the emergence of the gig economy, Congress enacted a law to address information reporting for participants in online marketplaces, such as eBay, as well as companies that facilitated payments, such as PayPal.[22]

41.    Codified at 26 U.S.C. § 6050W, the law required "payment settlement entities" to file information returns with the IRS to report payment card transactions and

---

[20] *Shortchanged* at 5-6, 8.

[21] Pew Research Center, *The State of Gig Work in 2021* 16 (Dec. 2021), *available at* https://www.pewresearch.org/internet/wp-content/uploads/sites/9/2021/12/PI_2021.12.08_Gig-Work_FINAL.pdf [https://perma.cc/S4VW-5ZYE].

[22] Housing and Economic Recovery Act, Pub. L. No. 110-289, § 3091, 122 Stat. 2654, 2908 (July 30, 2008).

third-party payment network transactions if the annual payments exceeded $20,000 ***and*** the aggregate number of transactions exceeded 200 transactions.[23]

42.    To implement the reporting requirements, the Treasury Department promulgated regulations under I.R.C. § 6050W and the IRS introduced Form 1099-K, Payment Card and Third Party Network Transactions, beginning with the tax year 2011.[24]

43.    To avoid duplicative reporting, the Treasury Department amended the regulations under I.R.C. § 6041 to include a tie-breaker rule providing those payments, which otherwise would be subject to reporting under both I.R.C. §§ 6041 and 6050W, were to be reported only under I.R.C. §§ 6050W regardless of whether the annual reporting thresholds of $20,000 and 200 transactions were exceeded.[25]

44.    The effect of the tie-breaker rule was to eliminate any information reporting for annual payments between $600 and $20,000 and for annual payments in ***any*** amount if the aggregate number of transactions did not exceed 200.[26]

45.    While designed to address concerns specific to marketplaces and payment facilitators, the tie-breaker rule created, as an unintended consequence, a substantial information reporting gap just as the gig economy was developing and the number of gig workers were growing exponentially.  A 2016 survey found that only 32 percent of gig workers who earned income in the platform economy in 2015 had received a Form 1099-MISC or Form 1099-K from their platform company.[27]

---

[23] *See* I.R.C. § 6050W(e) (eff. July 30, 2008).

[24] *See* Information Reporting for Payments Made in Settlement of Payment Card and Third Party Network Transactions, 75 Fed. Reg. 49821-01 (Aug. 16, 2010).

[25] *Id.* (located at Treas. Reg. § 1.6041-1(a)(1)(iv)).

[26] *Shortchanged* at 16 ("the existing information reporting regime effectively creates a $19,399 tax reporting loophole, which is the difference between $20,000 and $601—the income thresholds for Forms 1099-K and 1099-MISC.").

[27] *Id.* at 10.

46.    The IRS created a web page on IRS.gov called the "Sharing Economy Tax Center" to address some misperceptions and provide resources to taxpayers participating in the gig economy.  The IRS explained that gig economy income is taxable even though the payor did not report the payments to the IRS.  An early version of the web page stated:[28]

> An emerging area of activity in the past few years, the sharing economy has changed how people commute, travel, rent vacation places and perform many other activities. Also referred to as the on-demand, gig or access economy, sharing economies allow individuals and groups to utilize technology advancements to arrange transactions to generate revenue from assets they possess - (such as cars and homes) - or services they provide - (such as household chores or technology services). Although this is a developing area of the economy, there are tax implications for the companies that provide the services and the individuals who perform the services.

> This means if you receive income from a sharing economy activity, it's generally taxable even if you don't receive a Form 1099-MISC, Miscellaneous Income, Form 1099-K, Payment Card and Third Party Network Transactions, Form W-2, Wage and Tax Statement, or some other income statement. This is true even if you do it as a side job or just as a part time business and even if you are paid in cash. On the other hand, depending upon the circumstances, some or all of your business expenses may be deductible, subject to the normal tax limitations and rules.

47.    The IRS also made presentations on the gig economy at the 2016 and 2017 IRS Nationwide Tax Forums and posted information relating to the gig economy on the IRS's accounts on various social media platforms to increase communication and outreach to taxpayers.[29]

---

[28] Sharing Economy Tax Center, https://www.irs.gov/businesses/small-businesses-self-employed/sharing-economy-tax-center (captured Oct. 12, 2016, by the Wayback Machine, https://web.archive.org/web/20161012204956/https://www.irs.gov/businesses/small-businesses-self-employed/sharing-economy-tax-center) [https://perma.cc/ZX8Q-G2F6].

[29] *See* Treasury Inspector General for Tax Administration, *Expansion of the Gig Economy Warrants Focus on Improving Self-Employment Tax Compliance* 4 ("TIGTA Report"), 2019-30-016 (Feb. 14, 2019), *available at* https://www.tigta.gov/sites/default/files/reports/2022-02/201930016fr.pdf [https://perma.cc/9469-FPQU].

48.     Despite these efforts, the Treasury Inspector General for Tax Administration ("TIGTA") concluded that the emergence and expansion of the gig economy had expanded the information reporting gap associated with individual business income.[30]

49.     TIGTA analyzed the Form 1099-K reporting of three large platform companies which did not strictly adhere to the $20,000 *de minimis* reporting threshold, noting that this was atypical of most technology-based platforms.  TIGTA found that if just these three platform companies had strictly adhered to the higher reporting thresholds, "the IRS would not have been provided income information for 2.3 million (95 percent) taxpayers earning income in the gig economy from these platforms, involving $5.8 billion of income (54 percent)."[31]

50.     In late 2019, the IRS rebranded the "Sharing Economy Tax Center" as the "Gig Economy Tax Center" and provided specific resources to gig workers and digital platforms and businesses.  The web page introductory material read much as it does today:[32]

**What is the Gig Economy?**

The gig economy—also called sharing economy or access economy—is activity where people earn income providing on-demand work, services or goods. Often, it's through a digital platform like an app or website.

**Gig Economy Income is Taxable**

You must report income earned from the gig economy on a tax return, even if the income is:

- From part-time, temporary, or side work

---

[30] *Id.* at 31.

[31] *Id.* at 35.

[32] Gig Economy Tax Center, https://www.irs.gov/businesses/gig-economy-tax-center [https://perma.cc/ZMF3-GY6J].

- Not reported on an information return form—like a Form 1099-K, 1099-MISC, 1099-NEC, W-2 or other income statement

- Paid in any form, including cash, property, goods, or virtual currency

51. In 2021, I.R.C. § 6050W(e) was amended to lower the *de minimis* dollar threshold for Form 1099-K reporting to gross payments exceeding $600 and to remove the minimum number of transactions threshold altogether.[33]

52. The amendment was effective for calendar years beginning after December 31, 2021.[34]  However, in a series of notices, the IRS announced delayed enforcement and administration of the modified *de minimis* exception.[35]  Thus, payors will not be required to meet the amended statutory requirements until 2025.

## II.    JUSTANSWER LLC

### A.    Organizational Structure

53. JustAnswer was organized as a limited liability company in the State of Idaho on December 10, 2010,[36] and registered to do business in the State of California in 2011.[37]

54. JustAnswer is headquartered at 440 N. Barranca Avenue, #7508, Covina, California 91723.

55. JustAnswer operates the website JustAnswer.com.

---

[33] American Rescue Plan Act (ARPA), Pub. L. No. 117-2, Title IX, § 9674(a), 135 Stat. 4, 185 (Mar. 11, 2021).

[34] *Id.* § 9674(c)(1).

[35] Notice 2023-10, 2023-3 I.R.B. 403, 2022 WL 17959324 (Dec. 23, 2022); Notice 2023-74, 2023-51 I.R.B. 1484, 2023 WL 8110407 (Nov. 21, 2023).

[36] JustAnswer LLC's Certificate of Organization is attached as **Exhibit B**.  JustAnswer LLC's Annual Report filed November 4, 2022, is attached as **Exhibit C**.

[37] JustAnswer LLC's Application to Register Foreign Limited Liability Company is attached as **Exhibit D**.  JustAnswer LLC's Statement of Information filed February 24, 2022, is attached as **Exhibit E**.

### B.    JustAnswer Platform

56.    The JustAnswer Platform consists of the website, JustAnswer.com, and associated websites and applications on which Customers post questions on a variety of different topics for a fee, which are answered by Experts.  There is a mobile app available for Customers (JustAnswer app) and one for the Experts (JustAnswer: Experts).

57.    Customers create accounts on the JustAnswer Platform and are charged a fee to join, plus pay a monthly subscription fee which varies depending on the subject for which the Customer would like to ask questions.  Alternatively, Customers can pay per question.[38]

58.    To become an Expert, an individual completes an online application in which he or she must provide identifying information, including legal name, address, telephone number, email address, Social Security number, government issued identification, and relevant licenses or certifications.  The JustAnswer Platform utilizes a third-party verification service to check the applicant's credentials, which JustAnswer.com represents takes a few days.[39]

59.    Once approved, the Expert can begin answering questions on the JustAnswer Platform.  Experts are paid on a per-question-answered basis.  The payment for each answer depends on a number of factors, including which pricing model is utilized by the Customer, (Membership Model or Pay Per Question (PPQ)) the Expert's designated pricing tier, the Customer's rating of the answer, and the question value determined by JustAnswer.  Experts also receive bonuses paid by JustAnswer as part of its Question Incentive Program and/or from Customers as a Customer Paid Bonus (subject to 3 percent retention by JustAnswer).[40]

---

[38] Pricing, https://www.justanswer.com/pricing [https://perma.cc/GAT7-GN28].

[39] Become an Expert, https://era.justanswer.com [https://perma.cc/PFC9-A9KV].

[40] JustAnswer Expert Agreement, https://www.justanswer.com/info/expert-agreement [https://perma.cc/FWH7-LTGR].

60.    Based on information obtained during this investigation, during the relevant period, Experts were generally paid between $15 and $25 per question.

61.    Experts are identified to Customers on the JustAnswer Platform by a username.  The Expert's legal name and other identifying information are not required.  For example, in the "Meet the Experts" section of the homepage, Experts are identified only as "Chris, Master Mechanic," "Legal Eagle, Attorney at Law," and "Rebecca, Vet, Doctor of Veterinary Medicine."[41]

62.    Experts currently receive their earnings every month through Hyperwallet, a service of PayPal, and can choose to receive payments by direct deposit, PayPal, or Venmo.  Previously, Experts could only receive their monthly payments through PayPal.

63.    JustAnswer regards the JustAnswer Platform as a platform, neither providing the Customer with services nor employing the Experts who interact on its website.  Section 2 of its Terms of Service, entitled "The Platform," makes this position explicit:[42]

> The JustAnswer Platform is an online venue for informational and educational purposes and connects Customers with Experts. JustAnswer is not in the business of providing or selling information or education that is within any Expert's area of expertise, and JustAnswer otherwise does not provide advice or any professional service to Customers. Users of the Platform, not JustAnswer, provide the content in Posts (defined below). Experts are not employees or agents of JustAnswer. JustAnswer is not acting as an agent for any Customer. Experts have sole discretion in selecting which questions from Customers to answer, may elect not to answer any questions from Customers, and have sole discretion in controlling how to perform any Platform on the Platform.

64.    JustAnswer disclaims any relationship with Experts, stating in the Expert Agreement:

> You are an independent provider of services, and you represent and warrant you are authorized to conduct the services contemplated in this Expert Agreement in

---

[41] Ask an Expert & Get Answers to Your Questions—ASAP, https://www.justanswer.com (last accessed Jan. 25, 2023).  A printout of the webpage is attached as **Exhibit F**.

[42] JustAnswer Terms of Service, https://www.justanswer.com/info/terms-of-service [https://perma.cc/C7AR-CAJZ].

the location in which you operate. You further agree that you are not an employee of JustAnswer. . . .

* * *

No relationship (such as partnership, agent, joint venturer, or employee) between you and JustAnswer is created by this Expert Agreement or your participation on the Platform. You acknowledge that you are not an employee or agent of JustAnswer but are, like Customers, only Users of the Platform.

* * *

Expert acknowledges and agrees that Expert is obligated to report as income all compensation received by JustAnswer pursuant to this Agreement subject to applicable law in your jurisdiction. Subject to applicable law, Expert agrees to and acknowledges the obligation to pay all self-employment and other taxes on such income.

## C.   Suspected Noncompliance by JustAnswer Experts

### 1. Likely Noncompliance Based on Lack of Information Reporting

65.     According to JustAnswer, it has "thousands of experts who have answered over 16 million questions," and its Experts "[e]arn an average of $2,000-$7,000 a month."[43]

66.     After a thorough review of relevant internal IRS information systems, I determined that JustAnswer, did not file any information returns (Forms 1099-MISC, 1099-NEC, or 1099-K) reporting payments made to Experts as compensation for answering questions on the JustAnswer Platform for the tax years 2017 through 2020.

67.     JustAnswer began filing Forms 1099-NEC for the Experts in 2022, reporting payments made during the tax year 2021.  For the tax years 2021 and 2022, JustAnswer filed over 1,200 Forms 1099-NEC each year, reporting total payments of over $26.2 million and $32.5 million, respectively.  The amounts reported ranged from just above the $600 reporting threshold to over $800,000.  The median amounts of the reported payments were approximately $5,500 and $5,600 for the tax years 2021 and 2022, respectively.

---

[43] *See* Become an Expert, https://era.justanswer.com [https://perma.cc/PFC9-A9KV].

68.     Based on my experience as a revenue agent and on decades of IRS research and examination experience, as described in Part I of this Declaration, there is a high likelihood that the lack of information reporting for payments made to Experts for the tax years 2017 to 2020 led to significant noncompliance by the Experts in accurately reporting their income to the IRS.

### 2.  Likely Noncompliance Based on Interviews of Known Experts

69.     As part of the investigation, I conducted interviews of 30 Experts for whom JustAnswer filed Forms 1099-NEC for the tax year 2021.  All 30 Experts confirmed that they received compensation for answering questions as Experts on the JustAnswer Platform for one or more tax years prior to 2021.  Of the 30 Experts interviewed, 29 either confirmed that they had not received any Form 1099 for any tax year prior to 2021 or did not remember receiving a Form 1099 and could not locate one among their tax documents.

70.     Along with confirming that Forms 1099 had not been issued, several of the interviewed Experts stated that it was widely known that many other Experts did not report the income received from the JustAnswer Platform and that some other Experts even bragged about not reporting the income.

71.     Based on these interviews, there is a high likelihood of noncompliance by Experts in reporting the compensation earned through the JustAnswer Platform for the tax years 2017 through 2020.

### 3.  Likely Noncompliance Based on Examination Results

72.     Taxpayer 1 is a U.S. person.

73.     For tax years 2013, 2014, 2015, and 2016, Taxpayer 1 filed Forms 1040 with the IRS.  In 2020, Taxpayer 1 entered the IRS's Voluntary Disclosure Practice ("VDP").  VDP is a process through which taxpayers who have willfully failed to comply with tax, or tax-related obligations may submit a voluntary disclosure to resolve their non-compliance and limit exposure to criminal prosecution.  A taxpayer is only eligible to participate in VDP if the IRS has not already commenced a civil or criminal investigation

17

of the taxpayer and the IRS has not received information regarding the taxpayer's noncompliance from a third party or from a criminal enforcement action.[44]

74.    As part of Taxpayer 1's VDP submission, Taxpayer 1 disclosed the receipt of over $100,000 per year in income from answering questions as an Expert on the JustAnswer Platform for the tax years 2013 through 2016 that had not been reported on Taxpayer's 1 income tax returns.

75.    The failure to report income from the JustAnswer Platform resulted in a total understatement of Taxpayer 1's true tax liabilities for the tax years 2013 through 2016 of over $180,000.00.

76.    During the examination process, Taxpayer 1 confirmed that JustAnswer paid Taxpayer 1 exclusively through PayPal and that Taxpayer 1 did not receive any Form 1099 reporting the compensation from JustAnswer or PayPal.

77.    I have reviewed Taxpayer 1's examination files and concluded that Taxpayer 1's noncompliance was directly attributable to the income earned through the JustAnswer Platform and that the lack of information reporting on Form 1099 enabled Taxpayer 1 to omit the JustAnswer income from the tax returns without detection by the IRS, which had no information concerning Taxpayer 1's noncompliance until the voluntary disclosure was made.

### 4. Likely Noncompliance Based on Analysis of Identified Experts' Tax Information

78.    As part of the investigation, I identified four Experts who used their full names as their usernames on the JustAnswer Platform.  I identified these four individuals based on their use of their full names, as well as their stated geographic location, profession, and other public profile information.

---

[44] *See* IRS Criminal Investigation Voluntary Disclosure Practice, https://www.irs.gov/compliance/criminal-investigation/irs-criminal-investigation-voluntary-disclosure-practice [https://perma.cc/6HVC-H7RV].

79. I confirmed these individuals' identities using internal IRS systems, internet search engines, and people-locator services available to the IRS.

80. I then reviewed the identified Experts' answer histories and Customer Ratings, as shown on JustAnswer.com, and prepared estimates of the compensation the Experts earned through the JustAnswer Platform during the tax years 2017 through 2020 using $15 per question answered. I determined that rate based on information I obtained during the investigation, and it is a conservative estimate of the amount of compensation received per question answered.

81. I then analyzed the Experts' IRS account transcripts, tax returns, and third-party income information reporting for the tax years 2017 through 2020 to determine whether there were indications that income earned from the JustAnswer Platform was reported on the Experts' income tax returns and whether reported income was consistent with the estimated ranges.

82. In general, taxpayers whose gross income exceeds the exemption amount for tax year 2017 or the standard deduction for tax years 2018 through 2020 are required to file an income tax return for the taxable year. I.R.C. § 6012(a)(1) & (f). The exemption amount for tax year 2017 was $4,050. The standard deduction amounts for tax year 2018, 2019, and 2020 were $12,000, $12,200, and $12,400, respectively.

83. Additionally, taxpayers with self-employment income of $400 or more during the tax year are required to file a self-employment tax return. I.R.C. § 6017. Schedule C, Profit or Loss from Business, is used by taxpayers to report the income, expenses, and net earnings from self-employment. Schedule SE, Self-Employment Tax, is used to report self-employment tax. Both Schedules C and SE are generally attached to the Form 1040, U.S. Individual Income Tax Return.

84. Because of my research and analysis, I have concluded that the four Experts described below did not accurately report their compensation earned through the JustAnswer Platform for one or more of the tax years 2017 through 2020.

85. Taxpayer 2 is a U.S. person.

86. Based on the JustAnswer Platform profile, Taxpayer 2 has been answering questions on the website since 2011. In 2017, 2018, 2019, and 2020, Taxpayer 2 answered over 6,000, 13,000, 23,000, and 44,000 questions, respectively, on the JustAnswer Platform.

87. Based on Taxpayer 2's number of questions answered and Customer satisfaction rating, I estimated that Taxpayer 2 earned income through the JustAnswer Platform was in excess of $90,000, $195,000, $345,000, and $660,000 for the tax years 2017, 2018, 2019, and 2020, respectively.

88. I have reviewed Taxpayer 2's income tax returns for the tax years 2017 through 2020. Each of the income tax returns included a Schedule C which describes activity relating to online sales, rather than services. The Schedules C also report substantial costs of goods sold characteristic of the sale of products and other expenses which would not be characteristic of expenses incurred by an Expert on the JustAnswer Platform, a service-based activity.

89. Based on my experience as a Revenue Agent and on my analysis of Taxpayer 2's income tax returns, Taxpayer 2 did not accurately report compensation received for working as an Expert on the JustAnswer Platform for the tax years 2017, 2018, 2019, and 2020.

90. Taxpayer 3 is a U.S. person.

91. Based on the JustAnswer Platform profile, Taxpayer 3 has been answering questions on the website since 2016. In 2017, 2018, and 2019, Taxpayer 3 answered over 1,500, 7,000, and 11,000 questions, respectively, on the JustAnswer Platform.

92. Based on Taxpayer 3's number of questions answered and Customer satisfaction rating, I estimated that Taxpayer 3 earned income through the JustAnswer Platform in excess of $22,500, $105,000, and $165,000 for the tax years 2017, 2018, and 2019, respectively.

93. I reviewed Taxpayer 3's income tax returns for the tax years 2017 through 2019. For the tax years 2017 and 2018, the income tax returns do not include a Schedule

C or Schedule SE for Taxpayer 3 or any other indication that Taxpayer 3 reported income from the JustAnswer Platform on the returns.

94.    Based on my experience as a Revenue Agent and on my analysis of Taxpayer 3's income tax returns for the tax years 2017 and 2018, Taxpayer 3 did not report compensation received for working as an Expert on the JustAnswer Platform.

95.    For the tax year 2019, Taxpayer 3 filed a Schedule C and a Schedule SE. However, the reported income on the Schedule C is approximately $32,000 below my estimate of Taxpayer 3's income.

96.    Based on my experience as a Revenue Agent and on my analysis of Taxpayer 3's income tax return for tax year 2019, Taxpayer 3 did not accurately report compensation received for working as an Expert on the JustAnswer Platform.

97.    Taxpayer 4 is a U.S. person.

98.    Based on the JustAnswer Platform profile, Taxpayer 4 has been answering questions on the website since 2016.  In 2017, 2018, 2019, and 2020, Taxpayer 4 answered over 5,000, 4,000, 4,000, and 5,000 questions, respectively, on the JustAnswer Platform.

99.    Based on Taxpayer 4's number of questions answered and Customer satisfaction rating, I estimated that Taxpayer 4 earned income through the JustAnswer Platform in excess of $75,000, $60,000, $60,000, and $75,000 for the tax years 2017, 2018, 2019, and 2020, respectively.

100.    Taxpayer 4 did not file income tax returns for tax years 2017, 2018, and 2020.  Taxpayer 4 filed an income tax return for tax year 2019 reporting nominal interest income as the only source of income.

101.    Based on my experience as a Revenue Agent and on my analysis of Taxpayer 4's income tax return for the tax year 2019, Taxpayer 4 did not accurately report compensation received through the JustAnswer Platform for the tax year 2019.  I have also concluded that Taxpayer 4 was required to file an income tax return and self-

employment tax return reporting compensation received through the JustAnswer Platform for each of the tax years 2017, 2018, and 2020, and failed to do so.

102.    Taxpayer 5 is a U.S. person.

103.    Based on the JustAnswer Platform profile, Taxpayer 5 has been answering questions on the website since 2016.  In 2018, 2019, and 2020, Taxpayer 5 answered over 2,500 questions each year on the JustAnswer Platform.

104.    Based on Taxpayer 5's number of questions answered and Customer satisfaction rating, I estimated that Taxpayer 5 earned income through the JustAnswer Platform in excess of $37,500 in each of the tax years 2018, 2019, and 2020.

105.    Taxpayer 5 did not file an income tax return for tax years 2018 and 2020. Taxpayer 5 filed an income tax return for tax year 2019 reporting nominal interest income as the only source of income.

106.    Based on my experience as a Revenue Agent and on my analysis of Taxpayer 5's income tax return for the tax year 2019, Taxpayer 5 did not accurately report compensation received through the JustAnswer Platform for the tax year 2019.  I have also concluded that Taxpayer 5 was required to file an income tax return and self-employment tax return reporting compensation received through the JustAnswer Platform for each of the tax years 2018 and 2020 and failed to do so.

## III.    THE JOHN DOE SUMMONS REQUIREMENTS

107.    The IRS has commenced an investigation of unknown U.S. persons (John Does) who were paid $5,000 or more for answering questions as Experts on the JustAnswer Platform, in any one year, for the period January 1, 2017, through December 31, 2020.

108.    To facilitate this investigation, the IRS is seeking the Court's permission to serve, pursuant to I.R.C. §§ 7602 and 7609(f), a John Doe summons on JustAnswer LLC. A copy of this proposed summons is attached as **Exhibit A**.

109.    As described below: (A) the John Doe summons relates to the investigation of an ascertainable group or class of persons; (B) there is a reasonable basis for believing

that this group or class of persons may fail or may have failed to comply with provisions of the internal revenue laws; (C) the information sought to be obtained from the examination of the records (and the identity of the persons with respect to whose tax liabilities the summons will be issued) are not readily available from sources other than JustAnswer; and (D) the information sought in the summons is narrowly tailored to only information that is necessary for the IRS to identify and investigate whether individuals in the John Doe class complied with the internal revenue laws with respect to their compensation received as Experts.

### A.   The Summons Describes an Ascertainable Class of Persons

110.   The proposed John Doe summons to JustAnswer LLC, seeks information regarding U.S. taxpayers who were paid through, by, or on behalf of JustAnswer LLC, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "JustAnswer"), $5,000 or more for answering questions on the JustAnswer Platform, in any one year, for the period January 1, 2017, through December 31, 2020.  This class of persons is ascertainable in that the persons in the class are particularized from the general public by their characteristics of having been paid $5,000 or more for answering questions as an Expert on the JustAnswer Platform in any one year during the specified period.

### B.   There is a Reasonable Basis to Believe that Members of the John Doe Class May Have Failed to Comply with Internal Revenue Laws

111.   Payments received for answering questions, along with other services performed for compensation, through a website or other digital platform are gross income under the internal revenue laws, the receipt of which may give rise to federal tax liabilities.

112.   As detailed in this Declaration, the IRS has been aware for decades of significant tax noncompliance in the underreporting of individual business income and the relationship between the underreporting and the lack of information reporting associated with this type of income.

113.   The *de minimis* threshold of former I.R.C. § 6050W(e) and the tie-breaker

rule expanded this information reporting gap for payments made to individuals providing services through digital platforms, such that a substantial percentage of such individuals (and the IRS) did not receive a Form 1099-MISC, Form 1099-NEC, or Form 1099-K reporting their compensation received for the provision of services through digital platforms.

114.   IRS examination activity and statistical research shows that the net misreporting percentage — the level of noncompliance, for individual business income that is subject to little, or no information reporting is between 53.9 and 63 percent.  The most recent estimate is 55 percent for the tax years 2014 through 2017.[45]

115.   Millions of questions were answered through the JustAnswer Platform from 2017 through 2020 by thousands of Experts, who JustAnswer represents earn an average of $2,000 to $7,000 per month.  None of this compensation was reported to the IRS on Forms 1099 for the tax years 2017 through 2020.

116.   Information reporting received from JustAnswer for the tax years 2021 and 2022 reflects over 1,200 Forms 1099-NEC each year reporting over $26.2 and $27 million in payments, respectively.

117.   Based on my experience as a revenue agent and on decades of research by the IRS, the level of noncompliance among these Experts is consistent with that of other items of individual business income not subject to information reporting.  Thus, there is a reasonable basis to believe that tens of millions of dollars in compensation paid to Experts during the tax years 2017 through 2020 were unreported or underreported.

118.   The information and experience of the IRS suggests that many unknown U.S. taxpayers have received compensation from services performed through the JustAnswer Platform during 2017 through 2020.  Because the IRS does not know the identity of the individuals within the John Doe class, the IRS cannot yet examine the

---

[45] 2022 IRS Report  at 14 fig. 3; 2019 IRS Report  at 14 fig. 3; 2016 IRS Report at 12 cht. 1; 2012 IRS Report at 4 cht. 1; Tax Gap Map for Tax Year 2001 at 2.

income tax returns filed by those U.S. taxpayers to determine whether they have properly reported payments received for services performed through the JustAnswer Platform.

119.   Based on my investigation, I identified the specific individuals, discussed above, who received payments for services provided through the JustAnswer Platform and who failed to comply with their tax reporting requirements under the internal revenue laws.

**C.     The Requested Materials (and the Identities of the Members of the John Doe Class) are Not Readily Available from Other Sources**

120.   The use of usernames by Experts and the display of very limited personally identifiable information prevents the IRS from readily determining the identity of the Experts on the JustAnswer Platform.

121.   I have reviewed featured Experts displayed in nine subject categories on JustAnswer.com.[46]   Only 51 of the total 450 featured Experts (11.33 percent) used a full name in their usernames.   And the number of questions answered by the featured Experts who used full names was only 7.46 percent of the total questions answered by the featured Experts.

122.   Thus, the vast majority of featured Experts on the JustAnswer Platform do not use their full names and so cannot be identified by the IRS.

123.   For Experts who used a full name as their username, the IRS may still be unable to identify some Experts because the commonality of the names, locations, and professions prevents a positive identification; the name may not be the Expert's real name; and the Expert may be a non-U.S. person for which the IRS has no record.   This was the case for 27 of the 51 featured Experts who, despite the use of their full name in their usernames a positive identification was not possible.

---

[46] Printouts of the webpages displaying these Experts for the subject categories Lawyers, Doctors, Veterinarians, Mechanics, Electronics Technicians, Computer Techs, Electricians, Home Improvement Experts, and Tax Professionals are attached as **Exhibit G**.

124.   To my knowledge, and based on my experience, the only repository of the information sought by the proposed summons that is readily available to the IRS is JustAnswer.  The IRS does not already possess the requested information.

125.   Considering the above, the records sought by the John Doe summons are not otherwise readily available to the IRS.

**D.     The Requests in the Proposed Summons are Narrowly Tailored**

126.   The summons, attached as **Exhibit A**, seeks records that may reveal the identity and payment activity for U.S. persons who were Experts on the JustAnswer Platform, and who received $5,000 or more for answering questions, in any one year, for the period January 1, 2017, through December 31, 2020.  The information requested is narrowly tailored to assist the IRS with identifying U.S. taxpayers who may have failed to comply with the internal revenue laws and with determining these U.S. taxpayers' correct tax liabilities.  The requests in the summons are directed at two broad categories.

127.   First, the requests are directed at adequately identifying the John Doe class members.

128.   Second, the requests are directed at obtaining payment information so the IRS can evaluate whether the John Doe class members have fully complied with the internal revenue laws.

129.   Addressing the requests specifically, summons request number 1 reflected on **Exhibit A** seeks the complete Expert application and Account (as that term is defined in the JustAnswer Expert Agreement) records, including username(s), pseudonym(s), and/or handle(s), but excluding password(s).  These records will be used by the IRS to determine and verify the identity of each John Doe class member and to assist the IRS in determining whether each John Doe is a U.S. person.

130.   Summons request number 2 reflected on **Exhibit A** seeks all records of the number of questions answered through the JustAnswer Platform by the John Does class members during the period January 1, 2017, through December 31, 2020.  These records will be used to associate payments received by the John Does with the services performed

26

and confirm its taxable character.  These records are relevant in determining the federal tax liability of John Doe class members who are U.S. persons.

131.    Summons request number 3 reflected on **Exhibit A** seeks all records of activity in the John Doe class members' Accounts maintained with JustAnswer during the period January 1, 2017, through December 31, 2020, including, but not limited to, crediting of payments from Customers, Question Bonus Incentive Program Bonus Fees, Customer Paid Bonuses, and Premium Services fees.  These records are relevant in determining the compensation received and any associated federal tax liability of the John Does who are U.S. persons.

132.    Summons request number 4 reflected on **Exhibit A** seeks all records of payments to the John Doe class members by whatever means effected and all invoices, billing statements, receipts, or other documents memorialized and describing such transactions, during the period January 1, 2017, through December 31, 2020.  These records are relevant in determining the federal tax liability of the John Does who are U.S. persons.

133.    Summons request number 5 reflected on **Exhibit A** seeks all written communications between JustAnswer and the John Doe class members concerning federal tax matters, including but not limited, the issuance or non-issuance of IRS Forms 1099 by JustAnswer.  These records may be relevant in determining the federal tax liability of the John Does who are U.S. persons.

134.    Therefore, the information requested in the proposed summons is narrowly tailored to assist the IRS with identifying U.S. taxpayers who may have failed to comply with the internal revenue laws and with determining these U.S. taxpayers' correct tax liabilities.

**IV.    CONCLUSION**

135.    The information sought in the John Doe summons to be served on JustAnswer LLC, will allow the IRS to identify United States persons who may have failed to comply with their obligation to report and pay U.S. tax on income realized from

1  answering questions as Experts on the JustAnswer Platform during the years ending
2  December 31, 2017, through December 31, 2020.

3       I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing
4  is true and correct.

5       Executed this ___6th__ day of _ December _ 2024, in Las Vegas, Nevada.

6

7

8  _____
9  JOHN WOOD
10 Supervisory Revenue Agent
   Internal Revenue Service

11

Digitally signed by
John Wood
Date: 2024.12.06
06:48:14 -08'00'

28